## NORRIS v CITIZENS PUBLISHING CO

Ohio Appeals, 2nd Dist, Franklin Co

No 2086.   Decided Feb 16, 1932

Frank L. Monnett, Columbus, and Charles R. Doll, Columbus, for plaintiff.

J. N. Schooler, Columbus, and N. E. Blake, Columbus, for defendant.

ALLREAD, PJ.

It may be conceded that, as between the plaintiff, Jennie Norris, and the driver of the truck, that the driver was guilty of negligence and that the question of the plaintiff's contributory negligence, as between the plaintiff and the driver, was one which would require the case to go to the jury if there were no other questions presented.

The principal contention in this court is as to whether there was an independent contract between the publishing company and the driver of the truck, and whether the negligence therein charged must be related to the independent contract and not chargeable against the defendant. This is the important question in the case.

The Supreme Court, in the case of Schickling, an infant, versus the Post Publishing Company, 115 Oh St 589, held that the

contract between the Post Publishing Company and the driver of the truck was an independent contract, and that the publishing company was not charged with any liability on account thereof. A careful examination of the case decided convinces this court that the facts in that case are not exactly similar to and do not include all the facts shown in the case at bar. The most that was claimed and proven in the Schickling case was that the contractor, the driver of the touring car, was engaged in the performance of an independent contract for the delivery of newspapers from the publishing plant to various places of distribution; that in performing the service the said driver or independent contractor selected his own routes to reach the destination points marked on slips attached to bundles; that he drove at and where he pleased, and took no orders in such matters from anyone; that occasionally an employee of the Post Company rode in the back of the car to throw off the bundles as points of delivery were reached, and thus facilitated the work but that such employe had no control over the driver of the machine.

In the case at bar, the testimony goes somewhat farther. William Boyer, the officer or agent of the publishing company, testified as to the relationship between the driver of said truck and the company. Boyer testifies that Chester Fahner, the driver of the truck, made deliveries of the newspapers of each edition from the publishing house to the various points of distribution under an independent contract. In addition thereto, it appears that a workman for the company was allowed and permitted to ride on the bus and that this workman helped load and unload the papers from the truck; that the driver of the truck made a certain specified round each edition of the paper for the delivery of said papers. Boyer testified as follows (page 23):

"Q. How would he know when and how many to take, who would give him directions for that? A. I would.

"Q. That is, to Fahner? A. Yes.

"Q. And tell him where to go with them? A. Yes.

"Q. How many times a day would he have to get the instructions? A. Probably on each edition.

"Q. It depended, each edition, on your instructions, how many to take and where to take them? A. Yes."

On pages 25 and 27 Boyer testified:

"Q. And under whose direction was it that the number of trips he was to make, yours? A. Mine.

"Q. How many trips would you have him make a day? A. Each edition.

"Q. Each edition, that is four times a day he is under your orders as to the amount he should haul? A. Yes, sir."

On page 30:

"Q. You told him to put them on, or he wouldn't have put them on? A. That is right.

"Q. If he did not put them on you would have fired him? A. Probably.

"Q. You had a right to fire him if he didn't deliver the papers as you ordered them each day, if he did not do what you told him to do, you had charge of it? A. Yes, sir.

",Q. And he was subject to your orders? A. Yes, sir.

"Q. Daily orders and four times a day if necessary? A. Yes, sir."

Chester Fahner, the driver of the truck, was called as a witness by the plaintiff, and testified (page 65):

"Q. Would you ever pass any places where boys were located if Penzone would tell you to do so * * *? A. Not unless it would be on the route.

"Q. But if he would tell you to stop you would stop, wouldn't you? A. Yes, sir."

On page 77:

"Q. At all times after January 5, 1929, up to and including January 5, 1929, you were subject to the directions of Mr. Penzone; is that true?

"Mr. Schooler: Object to the question.

"The Court: Overruled.

"Mr. Schooler: Note an exception.

"A. Not unless you wanted to.

"Q. But if he told you to stop you would stop? A. Yes, sir."

Page 82:

"Q. Did Mr. Penzone call for the papers from the boys? A. Yes.

"Q. Did he collect from the stores where he made delivery? A. I don't know whether he did or not.

"Q. Did you ever take him back when you were on the route to make collections

from boys or stores? A. Yes.

"Q. Now how did you happen to do that? A. When I had to pick up papers.

"Q. Who would you tell to do that? A. I was told that when I first got the job.

"Q. Who was you told by, who was you told that by when you first got the job? A. Boyer."

Page 83:

"Q. Now then who would tell you where to stop when it came time to make collections? A. Mr. Penzone.

"Q. And you would make the stops when he would tell you to, wouldn't you? A. Yes, sir.

"Q. Now also you would pick up paper racks, wouldn't you? A. Yes.

"Q. At different times, is that not true? A. After the six o'clock trip we pick the racks up.

"Q. Isn't it true that Mr. Boyer said nothing at all to you about picking up paper racks or stands? A. He didn't say anything about the racks.

"Q. And who told you after you were employed to go and pick up the paper racks and stands, Penzone or Boyer? A. Mr. Penzone.

"Q. And you followed the instructions of Mr. Penzone to pick up the racks. A. Yes.

"Q. And you went to any designated place that he told you to go? A. Yes.

"Q. And then what did you do with the racks? A. Take them back into the office."

It also appears that an advertisement of the story published in the daily Citizen was put in large type on the sides of the car.

The instruction of the court for a directed verdict in favor of the defendant, the Publishing Company, rests upon whether this testimony offered tends to prove that the contract between the publishing company and Fahner was an independent contract. There are several railroad company cases decided by the Supreme Court which tests out whether a contract is an independent contract or not; one of these is **Hughes versus Railway Company, 39 Oh St 461.** The second, third and fourth syllabi are as follows:

"A corporation organized for the purpose of constructing and operating a railroad, having acquired its right of way by the exercise of the power of eminent domain or otherwise, may contract to another person for the construction of the whole or any part of the road without retaining the right to control the mode or manner of doing the work; and in such case the corporation is not liable to third persons for an injury resulting from the carelessness or willful act of the contractor.

"But if the corporation retains control over the mode or manner of doing the work, the relation of independent contractor does not exist and the employer is liable for injury to third persons from the carelessness or willful wrong of the contractor, while engaged in the performance of the work.

"The right reserved in the contract, on the part of the railroad company, to direct the quantity of work to be done, or the condition of the work when completed, is not a right to control the mode or manner of doing the work within the rule above stated."

In the case of **Clar v the Erie Railroad Company, 118 Oh St 612**, the same proposition is laid down by the Supreme Court as to the test between an independent contractor and a contractor wherein liability exists for personal injuries. We have considered the evidence in this case very carefully and have reached the conclusion that Chester Fahner had an independent contract with the publishing company for the delivery of papers from the publishing house to the various points of distribution and we are further of the opinion that the presence on the truck of Penzone and his alleged power to direct the driver of the truck did not amount to a control of the mode or manner of doing the work within the rule as decided by the Supreme Court. The control which either Boyer as the officer of the company exercised over Fahner, or of Penzone in his riding on the truck with Fahner, did not amount to such control over Fahner as would destroy the right of the independent contract. Again it is urged that the fact that Fahner was a minor of the age of seventeen years at the time of the accident, that he had the right to rescind the contract because of minority. However that is, we do not find that the contract was ever rescinded by the minor prior to the alleged accident, so that whatever rights the contract gave to the publishing company still remained, at the time of the accident. It is also contended that the fact that Fahner was a minor at the time the contract was made and at the time of the accident may impose upon the publishing company the ad-

180

ditional liability as to the mode and manner of the driving of the car. There is nothing in the record tending to prove that Fahner was an incompetent driver or that the agents of the publishing company knew of such fact at the time they made the contract with him or at any time during the period of the service. We therefore reach the conclusion that the Court of Common Pleas was justified in instructing a verdict for the defendant, and that such judgment must be affirmed.

HORNBECK and KUNKLE, JJ, concur.